IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:26-cv-04891-CNS

RAMON QUINTERO ALVAREZ,

Petitioner,

v.

JUAN BALTAZAR,
MARKWAYNE MULLIN,
DAVID VENTURELLA, and
TODD BLANCHE,

Respondents.

---

**ORDER**

---

Certain legal principles—perhaps some that are more technical in nature—are known to trained lawyers. Yet many of these principles are obvious to every American. For instance, that certain freedoms are "not the government's to take." *Stanford Daily Publ'g Corp. v. Rubio*, No. 25–cv–06618–NW, --- F. Supp. 3d ----, 2026 WL 2549090, at *1 (N.D. Cal. Aug. 28, 2026). This case concerns one such technical legal principle—*what must a disobedient party do to be held in contempt*—with one that is more obvious in nature—*everyone is entitled to due process.* This includes noncitizens residing in this country. *See, e.g., Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) ("The fourteenth amendment to the constitution is not confined to the protection of citizens. [Its] provisions are universal in their application, to all persons within the territorial jurisdiction, without

regard to any differences of race, of color, or of nationality.”); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (“[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all ‘persons’ within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.” (citation modified)). So too are noncitizens entitled to certain protections under this Nation’s statutes. *See, e.g., Santillan Quiroz v. Mullin*, 180 F.4th 1226, 1238–39 (10th Cir. 2026).

In this immigration habeas case, the Court must decide whether, as to this technical point, Respondents violated a court order. Make no mistake: They did.

The Court’s order proceeds as follows. *First*, it recites this case’s factual and procedural background. *Second*, it explains how Respondents violated an order of this Court, and what this means as a legal matter. *Third*, the Court asks and answers what it should do in light of their violations.

## I. BACKGROUND

Petitioner Ramon Quintero Alvarez, born in Mexico, sought habeas relief because Immigration and Customs Enforcement (ICE) detained him illegally. *See generally* ECF No. 4. Mr. Quintero Alvarez entered the United States with his mother sometime between 1993 and 1994. *Id.* at 3. He has not left the United States since arriving over thirty years ago. *Id.* In his own words, although Mr. Quintero Alvarez faced arrests for certain criminal charges, *id.*, the charges underlying his most recent arrest were ultimately dropped on April 24, 2026, *see id.* at 4. Mr. Quintero Alvarez testified that he has lived in Wyoming for approximately twelve years with his two sons—both American citizens—who due to his detention were living with their mother. Respondents did not challenge these factual

assertions or Mr. Quintero Alvarez's claim that his detention, which had been ongoing since February 2026, was unlawful. *Cf.* ECF No. 9.

Not only did Respondents fail to challenge these assertions. Respondents also failed to respond to the Court's order that should they fail to show cause as to why Mr. Quintero Alvarez's habeas petition should not be granted on or before October 27, 2026, Respondents were required to release Mr. Quintero Alvarez. In the Court's words, "if Respondents do not file a response to the Petition and Court Order by this deadline, Petitioner shall be released from custody no later than 24 hours after the response deadline, and Respondents shall file, no later than seven days after the response deadline, a status report informing the Court that Petitioner has been released." ECF No. 6.

This status report arrived on November 3, 2026. In this report, Respondents stated that Mr. Quintero Alvarez was "released from immigration custody on October 27, 2026." ECF No. 9 and 2. But there's more: He was "immediately re-detained," and at the time of the status report's submission "remain[ed] in detention." *Id.* Just as these representations were unequivocal, so too was Respondents' counsel's representation that they would "not be submitting a brief that argue[d] that" Mr. Quintero Alvarez's detention at the time was "lawful." ECF No. 9 at 1. Ergo, his detention was unlawful.

Given that the unlawfulness of Mr. Quintero Alvarez's re-detention was and should have been obvious to anyone, the Court ordered that Mr. Quintero Alvarez and Respondents appear for an in-person hearing on November 4, 2026. ECF No. 10. At such hearing, Respondents were ordered to answer the following questions: *When did Mr.*

*Quintero Alvarez's re-detention occur? Why? And where?* ECF No. 10. Respondents were ordered to guarantee Mr. Quintero Alvarez's attendance at this hearing. *Id.* Respondents were also ordered to ensure that an "appropriate official" from ICE would be in attendance. *Id.*

During the November 4, 2026, hearing, the first substantive representation made by Respondents' counsel was that Respondents' counsel were not claiming Petitioner's detention as it stood at the time of the hearing was lawful. In a subsequent colloquy with the Court, counsel doubled down, stating that he did "not dispute that" Mr. Quintero-Alvarez's re-detention was unlawful. Why then, were we there?

Here's why: Nichole Black, the Assistant Field Office Director for ICE's Enforcement and Removal Operations, soon after took the stand. As for, in counsel's words, the "facts and circumstances" surrounding Mr. Quintero Alvarez's re-detention, Ms. Black stated that she received a "direct order" from George Valdez, the Deputy Field Office Director—who himself received an order from the Acting Field Office Director, Nathan Rasper—to re-detain habeas petitioners "that had some type of criminality." Ms. Black was aware that Mr. Quintero Alvarez had been re-detained moments after his release on October 27, 2026. She specified that Mr. Quintero Alvarez was, at the time of his initial release, given his personal property. He then "walked out to the lobby," exited the detention facility "into a public area" where "officers met him outside and rearrested him." Ms. Black's colloquy with counsel ended there.

The Court then asked Ms. Black a series of questions. In response to these questions, Ms. Black confirmed that she was instructed to rearrest habeas petitioners,

including Mr. Quintero Alvarez, who had some type of "criminality." Regarding Mr. Quintero Alvarez's alleged "criminality," Ms. Black stated that she "knew" he had certain criminal charges pending at the time she reviewed Mr. Quintero Alvarez's record. But she was wrong. Ms. Black agreed that it was "fair" to say that she had inaccurate information regarding any current pending charge at the time she conducted her review of Mr. Quintero Alvarez's record.

She also testified that this "new policy" mandating that ICE and ICE agents immediately re-detain certain habeas petitioners following their court-ordered release meant that, even if a court in this judicial district ordered release for a habeas petitioner, ICE was permitted to immediately re-detain a habeas petitioner if the petitioner had some type of "criminality." As for Mr. Quintero Alvarez, Ms. Black was aware of the Court's order mandating his release when he was re-detained. But Ms. Black "believed" at the time of Mr. Quintero Alvarez's release that simply releasing him into a public area before re-detaining him amounted to compliance with the Court's prior order. At the time of the November 4 hearing, Ms. Black maintained that belief. She was also aware of "approximately ten" cases where ICE immediately re-detained habeas petitioners following their release pursuant to court orders.[*]

Following the testimony, the Court noted that this judicial district had entered into a memorandum of agreement with the United States Attorney's Office under which habeas releases would be effectuated consistent with court orders. And yet despite—or perhaps in spite—of this memorandum and court orders that have ordered petitioners'

[*] That was later increased to eighteen cases. *See generally* ECF No. 24.

immediate release, the Court observed that Respondents and ICE's new "policy" of immediately re-detaining petitioners following release made a mockery of court orders mandating petitioners' immediate release. The Court further observed that in this specific case, Respondents made no effort to show cause as to why the Court should not grant Mr. Quintero Alvarez's petition and order his immediate release. Thus, the Court ordered Mr. Quintero Alvarez's release and further ordered Respondents to produce Mr. Rasper at a hearing the Court scheduled for November 9, 2026.

At the start of the November 9 hearing, counsel for Respondents represented that the practice of immediately re-detaining petitioners had "ceased." ECF No. 26 at 10. Mr. Rasper then provided testimony regarding ICE's policy for immediately re-detaining habeas petitioners whose release was mandated by court orders. Under oath, Mr. Rasper testified that he understood ICE had an "obligation to make lawful arrests." *Id.* at 11–12. He heard from "[c]olleagues within [ICE]" that he and ICE agents were "able to rearrest cases based on a release." *Id.* at 12. Mr. Rasper heard about this from unnamed colleagues in Minnesota. *Id.* at 13.

As for the types of cases where immediate re-detention was permissible, Mr. Rasper stated that this was permissible where "the habeas release request was based on a technical nature of the documents." *Id.* And he ultimately concluded that—pursuant to conversations with ICE colleagues, the "deputy field office directors, and [the] ICE Office of Principal Legal Advisor Counsel"—immediate re-detention was "permissible because as ICE we had the statutory authority" to re-detain, "but it was to fix the situation of the forms, the technical." *Id.* at 13–14. Mr. Rasper further testified that this "approach"

was compliant with court orders directing release and consistent with ICE's "statutory authority," notwithstanding his acknowledgment that "ICE has to follow Court orders." *Id.* at 14; *id.* at 15 (testifying that that "new approach" did not violate court orders).

Mr. Rasper and ICE implemented this "new approach" in this judicial district on October 27, 2026. He himself verbally gave "general instructions" to Deputy Field Office Directors that "they were to look at the cases that were subject to release, review them with [ICE's] Office of Principal Legal Advisor chief counsel and make sure that there were no restrictions or circumstances restricting rearrest, and that . . . the arrests would be lawful and in compliance with statute, and then they were to follow those and then release the alien and then to re-arrest them." *Id.* Mr. Rasper believed that re-arrest was proper where a habeas petitioner was actually released. *See id.* at 16.

Yet during the November 9 hearing, Mr. Rasper stated that ICE had changed this "approach." *Id.* at 17. According to him, as a result of the Court's November 4, 2026, hearing, Mr. Rasper "directed the rearrest practice to stop and that those [habeas petitioners] who were arrested based on the rearrests would be released." *Id.* at 17.

During a colloquy with the Court, Mr. Rasper testified that he had been unaware of the memorandum of agreement regarding habeas petitions and only became aware of it "a day or two" prior to the November 9 hearing. *Id.* at 19. Having become aware of the memorandum and what occurred during the November 4 hearing, Mr. Rapser—consistent with the representation from Respondents' counsel—answered "Yes" to this statement from the Court: "But we can rest assured that going forward this will not be happening again." *Id.* And that this would not be happening again not only in this case,

but also that, going forward, any petitioner ordered released by the Court "would not be released and immediately re-detained." *Id.* at 20. Mr. Rasper concluded that, should ICE identify any issues with a petitioner's request for habeas relief, that such issues would be identified and presented to the Court within the seven-day period contemplated by the memorandum of agreement. *See, e.g.,* ECF No. 6.

As for the instruction regarding "criminality," when asked by the Court whether he "described that" for Deputy Field Office Directors and other ICE agents, Mr. Rasper testified, "No, I didn't." ECF No. 26 at 22. And regarding Ms. Black's testimony as to what she understood "criminality" to mean, Mr. Rasper testified "that was an overly compressed and kind of myopic view of what my instructions were. They were not clear, and so maybe it was a misunderstanding, but my instructions were clear to my deputy field office director about my expectations." *Id.* But Mr. Rasper clarified that, fundamentally, he instructed that all cases subject to the *immediate re-detention* "approach" were subject to review by the "Office of Principal Legal Advisor" and that this Office would make "a determination made about the legality of [ICE] being able to rearrest." *Id.* at 23. At the conclusion of his testimony, Mr. Rasper represented that he gave "specific instructions" that the new "approach" was "to stop and those rearrested were to be released," and reiterated that his "expectation is that the orders of the Court would be followed." *Id.* at 24.

At the end of Mr. Rasper's testimony and brief amicus argument, the Court summarized this case's factual and procedural background, and stated it would "issue an order—a written order on this matter, which is namely [the Court's] concern [that there]

was a blatant violation of this Court's order in rearresting Mr. Alvarez upon his first release." *Id.* at 32.

This is that order.

## II. DISCUSSION

"[I]t is long settled that courts possess inherent authority to initiate contempt proceedings for disobedience to their orders." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 793 (1987). *See also* 18 U.S.C. § 401 (establishing that a court "shall have the power to punish by fine or imprisonment . . . such contempt of its authority" where a party demonstrates "disobedience or resistance to" the court's "writ, process, order, rule, decree, or command"). As for civil contempt, *see id.*, "parties can be held in contempt for violating a court order." *Swietlicki v. Lessar*, No. 22–cv–02334–CYC, 2026 WL 1501103, at *1 (D. Colo. May 29, 2026) (citation modified)). *See also ClearOne Commc'ns, Inc. v. Chiang*, 670 F. Supp. 2d 1248, 1281 (D. Utah 2009) ("[C]ontempt is considered civil if the sanction imposed is designed primarily to coerce the contemnor into complying with the court's demands." (citation modified)); *Stransky v. HealthONE of Denver, Inc.*, 929 F. Supp. 2d 1100, 1113 (D. Colo. 2013) (explaining that civil contempt serves "'two [possible] purposes," one of which is "'to coerce the defendant into compliance with the court's order'" (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04 (1947)).

To be sure, a factual record must establish by clear and convincing evidence that a "valid court order existed," the defendant "had knowledge of the order," and that the defendant "disobeyed the order" in order for a party to be subject to civil contempt. *F.T.C.*

*v. Kuykendall*, 371 F.3d 745, 756–57 (10th Cir. 2004) (citation modified). A court must grant the disobedient party an opportunity to be heard, *see, e.g., AVT - New York, L.P. v. Olivet Univ.*, No. 2:18–cv–00782–JNP–DAO, 2022 WL 958529, at *2 (D. Utah Mar. 30, 2022), and typically civil contempt is contemplated where an aggrieved party files a motion seeking to hold the disobedient party to account, *see, e.g., Equifaz Servs., Inc. v. Hitz*, Civ. No. 89–2047–S, 1991 WL 17651, at *7 (D. Kan. Jan. 24, 1991), *aff'd sub nom. Equifax Servs., Inc. v. Hitz*, 968 F.2d 1224 (10th Cir. 1992). Although this is typical for contempt proceedings, recall that "it is firmly established that the power to punish for contempts is inherent in all courts," and "[t]his power reaches . . . disobedience to the orders of the Judiciary." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (citation modified); *Young*, 481 U.S. at 793.

Respondents were given ample opportunity at both hearings to be heard as to the contempt in which they could find themselves. Indeed, at the November 4, 2026, hearing, the Court provided formal notice that it viewed ICE's re-detainment of Mr. Quintero Alvarez as contempt of its October 20, 2026, order. ECF No. 6. And the November 9, 2026, evidentiary hearing provided opportunity for Respondents to question Mr. Rasper as to why and how the Court's prior order was disobeyed, and present argument regarding the same. *See, e.g., Daniel & Max LLC v. BAB Holding Co., LLC*, No. CV 19–173 GJF/GBW, 2021 WL 2953114, at *5 (D.N.M. July 14, 2021) ("Due process requires that [a litigant] have adequate notice of and fair opportunity to be heard on any finding of contempt." (citation modified)). Thus, the legal issue presented is quickly distilled: *Is there*

*clear and convincing evidence that Respondents had knowledge of a valid court order and yet violated it?*

The answer is *yes.* Ms. Black testified that she received, and had knowledge of, the Court's October 20, 2026, order. But that, despite its plain language, she believed it was permissible to immediately re-detain Mr. Quintero Alvarez—based on inaccurate information regarding his pending criminal charges. Ms. Black said in her own words that she believed it was permissible to simply escort someone to a public area and immediately re-detain them despite a court order to the contrary.

This should—and, in the Court's opinion, must—shock any reader. There is not a single word in this Nation's Constitution that sustains or could plausibly give rise to Ms. Black's "belief" that ICE and ICE agents can walk out to the sidewalk and re-shackle a habeas petitioner within a minute of that petitioner's court-ordered release. Notably, Mr. Rasper testified only that Mr. Quintero Alvarez's immediate re-detention was supported by statute, not by the Constitution. *See, e.g.,* ECF No. 26 at 13–14. But in any event, not only does the Constitution fail to support Ms. Black's belief and, in Mr. Rasper's words, the new, *immediately detain them again* "approach" that was hastily announced to ICE agents, *id.* at 14, it is a belief that necessarily depends on disregarding the fundamental way in which branches of government work.

Lest there be any confusion: "[A]ll orders and judgments of courts must be complied with promptly." *Maness v. Meyers*, 419 U.S. 449, 458 (1975). *See also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 654–55 (1952) ("The essence of our free Government is 'leave to live by no man's leave, underneath the law'—to be

governed by those impersonal forces which we call law. Our Government is fashioned to fulfill this concept so far as humanly possible.") (Jackson, J., concurring). This is neither a novel nor complex statement to comprehend. *See, e.g., A.A.R.P. v. Trump*, 145 S. Ct. 1034, 1036 (2025) ("Both the Executive and the Judiciary have an obligation to follow the law.") (Alito, J., dissenting); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 274 (1990) ("The Members of the Executive and Legislative Branches are sworn to uphold the Constitution, and they presumably desire to follow its commands."); *United States v. Lee*, 106 U.S. 196, 220 (1882) ("Courts of justice are established, not only to decide upon the controverted rights of the citizens as against each other, but also upon rights in controversy between them and the government.").

Mr. Rasper's own testimony helps explains why and how we got here. For him, Ms. Black simply misunderstood his instructions. It was all a simple misunderstanding based on her "overly compressed and kind of myopic view of what [his] instructions were. They were not clear, and so maybe it was a misunderstanding." ECF No. 26 at 22. Yet even presuming this to be true—and putting aside the effort to throw Ms. Black under the proverbial bus for unconstitutional behavior that runs top to bottom—"[i]n civil contempt proceedings, disobedience of the order need not be willful." *ClearOne*, 670 F. Supp. 2d at 1282. Instead, "[a] district court is justified in adjudging a person to be in civil contempt for failure to be reasonably diligent and energetic in attempting to accomplish what was ordered." *Id.* (citation modified). Re-detaining someone immediately is hardly an effort to even "*attempt* to accomplish" the Court's order to release Mr. Quintero Alvarez. *Id.* (emphasis added). If anything, it is an effort to *thwart* his release. This is precisely the

disobedient conduct that contempt proceedings contemplate, and words straight from the horse's mouth are undoubtedly clear and convincing evidence that ICE and Respondents meet all the requirements for the Court to hold them in civil contempt. *See, e.g., Silva v. Dos Santos*, 68 F.4th 1247, 1255 (11th Cir. 2023) ("[A] single witness's testimony alone can be sufficient to satisfy a party's burden to prove a fact by clear and convincing evidence."); *United States v. Cyphers*, 553 F.2d 1064, 1070 (7th Cir. 1977) ("believe[ing]" witness's testimony "was clear and convincing").

* * *

To recap: civil contempt is appropriate where clear and convincing evidence shows that a valid court order existed—*check*—Respondents had knowledge of that order—*check*—and Respondents disobeyed it—*check. See Kuykendall*, 371 F.3d at 756–57. So, what to do now?

The first is to find that Ms. Black, and by extension, Respondents, were in clear contempt of the Court's October 20, 2026, order. Ms. Black was in contempt at the time she implemented the "new approach" of re-detaining Mr. Quintero Alvarez on October 27, 2026, until November 9, 2026, when Mr. Rasper made clear that this "approach" had ceased, and that ICE and Respondents would no longer immediately re-detain habeas petitioners who are ordered released by court order. This amounts to a "purge" of Ms. Black and Respondents' obvious contempt and violation of the Court's order. *See Cottriel v. Jones*, 588 F. App'x 753, 757 (10th Cir. 2014) ("In civil contempt, the contemnor is able to purge the contempt . . . by committing an affirmative act to bring himself into compliance." (citation modified)).

In other words, the single thing that saves Ms. Black and Respondents is Mr. Rasper's unequivocal representation that ICE has "ceased" its *immediately re-detain them* "approach" as a result of the November 4 hearing. And don't forget this is sworn testimony. "Such testimony is binding upon him." *Draper v. State of Md.*, 265 F. Supp. 718, 723 (D. Md. 1967). And so, this representation at the November 9, 2026, hearing, essentially cured Ms. Black's and Respondents' contempt.

Sometimes, behavior stuns and renders a listener speechless. In one turn of phrase, *lost for words.* To the extent any reader may be *lost for words* as to what ICE and Respondents did in this case and others in this judicial district like it—and the ridiculous nature of the justification for their behavior—turn to what the Supreme Court has said repeatedly over the course of our Nation's history. "The government of the United States has been emphatically termed a government of laws and not of men." *State of Louisiana ex rel. Elliott v. Jumel*, 107 U.S. 711, 743 (1883). "Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law." *Davis v. Passman*, 442 U.S. 228, 246 (1979) (citation modified). "'All men are equal before the law,' 'This is a government of laws and not of men,' 'No man is above the law,' are all maxims showing the spirit in which Legislatures, executives and courts are expected to make, execute and apply laws." *Truax v. Corrigan*, 257 U.S. 312, 332 (1921). Any reader—and chief among them, Respondents—would do well to keep these binding statements in mind.

## III. CONCLUSION

For the reasons set forth above, the Court finds that Ms. Black and Respondents were in contempt of court prior to November 9, 2026. But given that Respondents cured the contempt by ceasing the practice at issue, the Court DECLINES to take any further action. Given that Petitioner has been released, Petitioner's remaining motions are DENIED AS MOOT. ECF Nos. 16–17. The Clerk of Court is directed to close this case.

DATED this 18th day of November 2026.

BY THE COURT:

______________________________
Charlotte N. Sweeney
United States District Judge